United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NORA LUZ SERRATO,

            Petitioner,

   v.

SCHELIA A. CLARK et al.,

            Respondents.

_____/

No. C 05-03416 CRB

**MEMORANDUM AND ORDER**

Now pending before the Court is petitioner's consolidated motion for a preliminary injunction and petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. Petitioner seeks to enjoin the Federal Bureau of Prisons from terminating its Shock Incarceration Program. Petitioner is currently incarcerated at FCI Dublin, a prison facility located within this district. After carefully considering the parties' briefs, and with the benefit of extended oral argument, the Court hereby DENIES the petition.

### BACKGROUND

On November 29, 1990, Congress passed the Crime Control Act, which included a provision authorizing the Federal Bureau of Prisons ("BOP") to create the Shock Incarceration Program, also known as the Intensive Confinement Center Program or the "boot camp" program (hereinafter "the Program"). 18 U.S.C. § 4046. On November 1, 1991, the United States Sentencing Commission promulgated the Shock Incarceration Program Sentencing Guideline, which gives the sentencing court the authority to recommend

United States District Court

For the Northern District of California

that BOP place a defendant in a boot camp pursuant to the statutes authorizing judicial recommendations.  U.S.S.G. 5F1.7.  For the first five years of the Program's existence, BOP issued Operations Memoranda that oversaw implementation of the Program.  In 1996, BOP promulgated rules governing the Program that were subject to notice-and-comment under the APA.  61 Fed. Reg. 18658 (Apr. 26, 1996), codified as 28 C.F.R. § 524.  BOP also issued a program statement overseeing the Program in 1999.  See Program Statement 5390.08.  BOP rules provide for a substantial reduction in actual prison time for those who successfully complete the Program, including up to a six month reduction in sentence.[1]

As part of the original statute, Congress authorized "the appropriation of such sums as are necessary to carry out the legislation for fiscal year 1990 and thereafter," but the Program was always funded out of Congress's lump-sum appropriations to the BOP for all of the agency's expenses and salaries.  In 2004, BOP faced a deficit of $150 million.  Resp. Opp. at *14.  BOP contends that the boot camp program costs an additional $1.2 million.  See Message to All Staff from Harley G. Lappin, January 5, 2005 (Pet. Exh. L).  On January 5, 2005, the Director of BOP notified his staff that the Program would be terminated.  On January 14, 2005, the Director sent a letter to all federal judges, chief U.S. probation officers, federal public defender's and United States attorneys, formally informing them of the termination of the Program "effective immediately" because of the Program's limited success and its high cost.  See Pet. Exh. M.  The letter indicated that those inmates who were currently in the Program were permitted to complete it, but no new inmates were allowed to commence the Program.  The last class at FPC Bryan, Texas, the only facility that provided a boot camp program for women, completed its six-month program on June 28, 2005.  Def. Opp. at *6.

//

//

---

[1]The BOP regulation provides: "An eligible inmate with a sentence of not more than thirty months who successfully completes the institution-based program, who maintains successful participation in a community-based program, and who has supervised release to follow is eligible for up to a six month reduction in sentence."  61 Fed. Reg. 18658 (Apr. 26, 1996); accord Program Statement 5390.08 (Nov. 4, 1999).

**United States District Court**

For the Northern District of California

## I.    Facts

Petitioner is a 22-year-old first offender who, on May 5, 2003, pled guilty in federal court in the District of Oregon to one count of possession of 50 grams or more of methamphetamine with the intent to distribute under 21 U.S.C. § 841(a).  Pet. Exh. I. Petitioner requested that the court recommend her for the boot camp program, which the court did on October 16, 2003, in addition sentencing her to 37 months in federal prison. One month later, the Regional Director of BOP informed the sentencing court that a 37-month sentence precluded petitioner from direct commitment to the boot camp program; instead, she would be eligible for transfer when 24 months remained on her sentence. Pet. Exh. J.  On September 10, 2004, the district court amended its judgment and re-sentenced petitioner to 30 months imprisonment, which, assuming she fit other relevant criteria, would have made her eligible for direct commitment to the Program.  See BOP Program Statement § 524.31, Pl. Exh. H at *4. ("Inmates serving sentences of more than 12 but not more than 30 months are ordinarily placed in ICCs at initial designation.").

Nevertheless, petitioner was designated to FCI Dublin, where there was never a boot camp program.  Petitioner voluntarily surrendered to Dublin on November 5, 2004. Shortly after her surrender, it became clear to petitioner that BOP incorrectly believed that her sentence was still for 37 months.   BOP subsequently corrected petitioner's records to reflect the amended judgment and sentence.  The parties dispute whether she was told by her case manager that she *was* eligible for a transfer to boot camp in Bryan, Texas, or that she *might be* eligible.  Nevertheless, petitioner was informed less than two weeks later by her case manager that the boot camp program was being cancelled by BOP and that it would not be accepting any more referrals.  Shortly after May 2, petitioner was offered the possibility of enrolling in a state-run boot camp, with assurances that she would receive the same benefits as under the federal program.  The parties dispute what followed with regard to the state run boot camp, but after a preliminary hearing in this matter on November 17, petitioner was accepted into the Wisconsin boot camp program beginning on or about December 20, 2005. BOP also agreed to transfer her to a community corrections center near her home following

1   completion of the Wisconsin boot camp for 30 days before releasing her on or about July 20,

2   2006.

3   **II.     Procedural History**

4           In April 2005, petitioner filed a habeas petition under 28 U.S.C. § 2255 to the

5   sentencing judge in Oregon.  On July 14, 2005, district judge Anna Brown dismissed the

6   petition for lack of jurisdiction because petitioner was challenging the execution--not the

7   imposition--of her sentence.  Pet. Exh. A.  On August 23, petitioner filed a habeas petition

8   under 28 U.S.C. § 2241 in this court because she is incarcerated in the northern district and is

9   challenging the proper execution of her sentence.  On September 26, 2005, petitioner filed a

10  motion for a preliminary injunction.  The parties agreed to consolidate briefing on the motion

11  for preliminary injunction and the petition for writ of habeas corpus.  Despite her enrollment

12  in the Wisconsin boot camp, petitioner's claims are not moot because the harm she alleges

13  cannot be fully remedied: If she prevails on her claim, her time in federal prison may have

14  exceeded what she would have received if she directly entered the federal boot camp

15  program under BOP's regulations.  The Court held an extended oral argument on December

16  1, 2005.

17                              **DISCUSSION**

18          Petitioner argues that she is likely to succeed on the merits because BOP 1) exceeded

19  its statutory authority; 2) failed to adhere to the notice-and-comment requirements under the

20  APA for substantive rule changes; 3) made an unreasonable and arbitrary decision to

21  terminate the Program which deserves no deference; and 4) violated the United States

22  Constitution under the *Ex Post Facto* Clause, the separation of powers doctrine, and

23  impermissibly applied its decision retroactively.  Petitioner relies heavily on a district court

24  case in Massachusetts where the court determined that BOP's decision to terminate the

25  Program was invalid because it violated the notice-and-comment requirement under the

26  Administrative Procedure Act and the *Ex Post Facto* Clause.  See Castellini v. Lappin, 365

27  F.Supp.2d 197 (D. Mass. 2005) (Saris, J.).  The case was eventually dismissed on other

28  grounds. See Barnes v. Lappin, 2005 WL 2456229 at *2 (M.D. Fla Oct. 5, 2005).

United States District Court

For the Northern District of California

Respondents argue that petitioner cannot succeed on the merits because 1) petitioner lacks standing and failed to exhaust her administrative remedies; 2) BOP properly used its discretion under its statutory authorization when it terminated the Program; 3) BOP adhered to all of the relevant and applicable administrative laws but was not required to publish the rule for notice-and-comment; 4) BOP's decision did not implicate the *Ex Post Facto* Clause or the separation of powers doctrine of the U.S. Constitution; and 5) petitioner did not have settled expectations necessary to invoke the retroactivity doctrine.  Respondents rely heavily on dicta in a district court case in Oregon where the court rejected a defendant's arguments that BOP's decision violated separation of powers, the *Ex Post Facto* Clause, the notice-and-comment requirement and arbitrary and capricious standard under the ADA, and that it exceeded statutory authority.  United States v. McLean, 2005 WL 2371990 at *5 (D. Or. Sep. 27, 2005) (Aiken, J.) (granting defendant's motion on due process grounds not at issue here, holding that the court detrimentally relied on objectively unreliable information--the existence of the boot camp program--that was material to her sentence).[2]  This case is a matter of first impression in this district and this circuit.

## I.     Threshold Matters

### A.     Standing

To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  Rivas v. Rail Delivery Service, Inc., 423 F.3d 1079, 1082 n.1 (9th Cir. 2005) (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-181 (2000).  A plaintiff demonstrates injury in fact by pointing to "some threatened

---

[2]On October 25, 2005, Judge Aiken re-sentenced McLean to a sentence that approximated the sentence McLean would have received had he completed the boot camp program (one year and one day in prison, up to six months in community corrections, and up to 180 days in home confinement).

1  or actual injury resulting from the putatively illegal action." Id. at 1082-1083 (internal

2  citations omitted).

3      Respondents contend that petitioner suffered no injury in fact because she was never

4  accepted into the boot camp program before it was terminated.  Her only cognizable interest,

5  according to respondents, is to be *considered* for the Program at the discretion of BOP; there

6  are no guarantees that any inmate will be accepted into the Program, even inmates who

7  benefit from initial designation into prisons with the Program.  As a result, a favorable

8  decision will not redress the problem, because all petitioner would be entitled to is an

9  evaluation as to whether she could be admitted to the Program.  Most important, even if she

10  were admitted into the Program, respondents assert, the benefits would not be conferred until

11  she completed the Program.  Therefore, she would only have standing upon completion of

12  the boot camp program, and she has not (and cannot) show she would have completed the

13  Program and therefore does not have standing.  Finally, respondents argue that no inmates

14  were admitted to the Program after July 22, 2005, so even if petitioner was directly

15  designated to a facility with the Program after receiving her amended sentence in September

16  2005, she would not have been accepted into the Program before it was terminated.

17      Petitioner responds with three arguments to the contrary.  First, she contends that had

18  BOP followed their proper procedures, petitioner would have reported directly to the boot

19  camp facility in Texas prior to BOP's decision to refuse any more referrals.  Petitioner

20  contends that respondents' argument is circular: In effect, respondents argue that she cannot

21  have standing because she was never accepted (or completed) the Program, but the

22  cancellation of the Program was a "but for" cause of her failure to be accepted.  Similarly,

23  petitioner contends that if she should have been directly designated to the Program, then it is

24  immaterial whether her sentence and surrender occurred after the last inmates were accepted

25  into the Program.  In fact, petitioner argues, that is precisely why she has standing:

26  Petitioner's injury derives from the termination of the Program, not whether she was too late

27  to be admitted to the now-terminated Program.

28  //

**United States District Court**

For the Northern District of California

1    Second, petitioner argues that she, her lawyer and the judge relied on this

2  recommendation (to her ultimate detriment) when the sentencing occurred, thereby

3  bestowing a "settled expectation" of participating in the boot camp program upon being

4  recommended for it.  Even assuming *arguendo* that she was not guaranteed placement in a

5  boot camp program, the judge's recommendation to a boot camp program and the possibility

6  of participating in the Program factored into her decision to plead guilty.  When factors that

7  she relied on changed, petitioner argues that she therefore has suffered a cognizable injury.

8  Finally, she also alleges that her case manager told her she was eligible for the Program

9  before correcting herself five days later when she learned that no more referrals were

10  available.  Respondents contend that she was told she *might* be eligible.

11    One court in the southern district of Texas has addressed the identical issue on two

12  occasions and both times determined that the petitioner did not have standing.  See Soto v.

13  Federal Bureau of Prisons, 2005 WL 2921641 (S.D. Tex. Nov. 3, 2005); Rivas v. Federal

14  Bureau of Prisons, 2005 WL 3054577 (S.D. Tex, Nov. 14, 2005).  Both opinions are

15  essentially identical, and in both, the court held that the petitioner did not have standing

16  because there was no showing that she would have been eligible for, or benefitted from, the

17  federal boot camp, and therefore her injury was speculative, not concrete.  Although the court

18  noted the petitioners' failure to allege or show a number of preliminary requirements for

19  admission into the Program, the crux of the holding is that the petitioners would not have

20  standing until they completed the Program.

21    The Court respectfully disagrees with the Texas court's conclusion that standing can

22  only be conferred upon *completion* of the Program. Notwithstanding the fact that such a

23  conclusion would bar any claim opposing BOP's decision,[3] that is not the law in the Ninth

24  Circuit.  The Ninth Circuit has held that "[a] prisoner's right to *consideration* for early

25  release is a valuable one that we have not hesitated to protect." Cort v. Crabtree, 113 F.3d at

26  1085 (emphasis in original).  In Cort, the court held where the only remaining program

27

28    [3]Any claim by a prisoner who has actually completed the Program would be moot unless BOP refused to reward her with the proper sentence reduction, which is not the case in this situation.

7

condition to be completed is entirely within a prisoner's control--i.e., completion of the Program--BOP cannot deny that the right to the sentence reduction has been properly conferred. Petitioner's eligibility for the Program is no longer disputed since she has already been accepted into a similar, state-run boot camp in Wisconsin. As a result, BOP's termination of the Program created a cognizable and concrete injury in fact that could be redressed if the Court determines the decision was improper or illegal. Thus the Court finds that petitioner has standing to bring this petition.

## B.    Failure to Exhaust Administrative Remedies

In addition, respondents contend that like all actions challenging prison conditions, petitioner must first exhaust her administrative remedies. The BOP administrative remedy process provides three levels of review before exhaustion applies. Def. Opp. at *9. Because petitioner did not complete the entire administrative review process, respondents contend that she has failed to exhaust those remedies and therefore cannot file this suit.

Petitioner counters that administrative review is futile in this case because the agency has taken action in a manner that eliminates any viable remedy. More importantly, petitioner contends that the exhaustion requirement is not jurisdictional where equity is invoked to remedy violations of rights in the execution of a sentence.

Respondents rely on Porter v. Nussle, 534 US. 516 (2002), for the proposition that "[t]his exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Def. Opp. at *9 (quoting Nussle, 534 U.S. at 532). Yet respondents mischaracterize the import of this statement, which only applies to the Prison Litigation Reform Act, which is not relevant here. Respondents further rely on Chua Han Mow v. United States to argue that exhaustion is a prerequisite to litigation in federal court. See Chua Han Mow v. United States, 730 F.2d 1308 (9th Cir. 1983), cert. denied, 470 U.S. 1031 (1985). Yet Chua Han Mow addressed a claim that the prisoner deserves credit for time served, an area expressly outside "the province of the sentencing court." Id. (quoting United States v. Clayton, 588 F.2d 1288, 1292 (9th Cir. 1979)).

United States District Court

For the Northern District of California

1    Here, however, the Court acts as a court in equity, a province particular to its

2    jurisdiction.  No administrative review can resolve a motion in equity; therefore, the Court

3    finds that petitioner need not exhaust her administrative remedies before filing this petition in

4    this Court.

5    **2.    Substantive Issues**

6         **A.    Statutory Construction**

7    The parties dispute whether BOP exceeded its authority in terminating the Program.

8    To this end, the primary concern is whether 18 U.S.C. section 4046 obligates BOP to

9    administer the Program or whether its implementation is discretionary.  In interpreting a

10   statute, a court must first examine its language.  "If the statute is clear and unambiguous, that

11   is the end of the matter.  There is no need to look beyond the plain meaning in order to derive

12   the 'purpose' of the statute" unless the result is absurd.  See Bowen v. Hood, 202 F.3d 1211

13   (9th Cir. 2000) (quoting Tang v. Reno, 77 F.3d 1194, 1196 (9th Cir. 1996)) (some internal

14   quotations omitted).

15   Petitioner first argues that a plain reading of the statute assumes the existence of the

16   Program.  Although the statute provides BOP with considerable discretion in administering

17   the Program, it does not permit BOP to terminate the Program in its entirety.  Moreover,

18   petitioner argues, BOP's discretion under the statute does not extend to a determination of

19   *whether* to offer the Program at all; rather, BOP merely has individualized discretion

20   regarding *which* prisoners could participate and *how* the Program should be structured and

21   implemented.  Second, despite acknowledging the broad discretion delegated to BOP by the

22   statute, petitioner argues that some discretion must exist in order for it to be exercised.  By

23   completely eliminating the Program, petitioner asserts that BOP no longer has any discretion

24   to exercise and has therefore exceeded its discretionary authority under the statute.  Finally,

25   petitioner argues that BOP's decision to terminate the Program improperly renders the statute

26   a nullity and is therefore not a proper exercise of its discretion.  See INS v. Yueh-Shaio

27   Yang, 519 U.S. 26 (1996).

28   //

9

**United States District Court**

For the Northern District of California

1         Respondents argue that a plain reading of the text merely authorizes BOP to place

2 prisoners in the Program and does not require them to do so.  See 18 U.S.C. § 4046 (BOP

3 "*may* place in a shock incarceration program any person who is sentenced to a term of

4 imprisonment of more than 12, but not more than 30, months, if such person consents to that

5 placement") (emphasis added).  In particular, respondents note the distinction between the

6 use of the word "may," which implies discretion, with the use of the word "shall" later in the

7 same section.  See Lopez, 531 U.S. at 241 (underscoring distinction of the discretionary word

8 "may" with the obligatory word "shall" in statutory construction).  Since BOP

9 unquestionably has broad discretion with regard to the implementation of the Program,

10 respondents argue that it therefore has discretion as to whether to implement the Program

11 altogether.

12         The Court finds that the statute is clear and therefore it need not proceed past a plain

13 meaning of the statute.  The statute, in establishing the Program, uses the word "may" to refer

14 to BOP's delegation of authority in administering the Program.  See 18 U.S.C. § 4046(a).

15 When describing the inmate's requirements and elements of the Program, however, the

16 statute uses "shall" to indicate BOP's obligations in administering the Program.  See 18

17 U.S.C. § 4046(b) ("For such initial portion of the term of imprisonment as the Bureau of

18 Prisons may determine, not to exceed 6 months, an inmate in the shock incarceration program

19 *shall* be required to–....") (emphasis added).  In Lopez, the Court noted a similar distinction

20 within the substance abuse treatment program statute, 18 U.S.C. § 3621(e), and held that the

21 use of the word "may" bestowed on BOP the "authority, but not the duty" to act in

22 accordance with the statute.  531 U.S. at 241; see also Jama v. Immigration and Customs

23 Enforcement, 125 S.Ct. 694, 703 (2005) (noting that the word "may" customarily denotes

24 discretion, particularly where "'may' is used in contraposition to the word 'shall'").

25 Otherwise, "Congress' use of the word 'may,' rather than 'shall,' has no significance."

26 Lopez, 531 U.S. at 240.  Likewise, the statute here merely authorizes BOP to provide for a

27 shock incarceration program but does not require BOP to provide one.  Therefore, the Court

28 finds that terminating the Program did not exceed BOP's discretion under the statute.

**United States District Court**

For the Northern District of California

1   The Court is not persuaded by petitioner's argument that BOP's decision exceeds its

2   authority because it renders the statute a nullity.  In support of this somewhat novel argument

3   petitioner cites to a footnote in <u>Lopez</u> where the Supreme Court "found that the BOP's

4   discretion cannot sweep so broadly as to nullify the statute." Pet. Reply at *7.  Yet petitioner

5   overstates her claim.  In <u>Lopez</u>, the Court cited <u>Yueh-Shaio Yang</u> and noted that BOP's

6   discretionary decision did not render the statute a nullity because some prisoners continued to

7   receive a sentence reduction under the statute after the decision was made. 531 U.S. at 243

8   n.4 (citing <u>Yueh-Shaio Yang</u>, 519 U.S. at 31).  The relevant passage in <u>Yueh-Shaio Yang</u>,

9   however, was a hypothetical proposition suggested in dicta by Justice Scalia.  Moreover, the

10  discussion of this argument in a footnote in <u>Lopez</u> was also dicta, and the Court merely

11  disregarded the theory as inapplicable in that case.  Petitioner, however, has cited to no case,

12  nor can the Court find a case, where a court has held that an agency's decision improperly

13  rendered a statute a nullity.  Even if this argument benefitted from support elsewhere, it

14  would not apply here.  Since the statute did not require BOP to implement the Program, it is

15  fair to interpret the statute as authorizing the creation and implementation of the Program. It

16  is conceivable that in future years BOP will reverse its course and once again allocate funds

17  to administer a boot camp program.  To do so, it would rely on the congressional

18  authorization found in section 4046.  As a result, the statute still maintains its purpose into

19  the future and is therefore not rendered a nullity.

20      **B.      Separation of Powers**

21      This conclusion also defeats petitioner's separation of powers argument. Petitioner

22  contends, and respondents concede, that Congress created the boot camp program.  <u>See</u>

23  Section 3002 of Pub. L. 101-647, 104 Stat. 4915 ("There are authorized to be appropriated

24  for fiscal year 1990 and each fiscal year thereafter such sums as may be necessary to carry

25  out the shock incarceration program *established under the amendments made by this Act*.")

26  (emphasis added); <u>see</u> Resp. Opp. at *4 ("On November 29, 1990, Congress created the

27  federal boot camp program.").  Because an act of Congress created the Program, however,

28  petitioner argues that Article I, section 7 of the U.S. Constitution dictates that an agent or

agency of the Executive Branch cannot unilaterally repeal an act or part of an act without congressional authorization.  See Clinton v. New York, 524 U.S. 417 (1998) (holding that the Presentment Clause forbids the Executive Branch from vetoing particular sections of a bill of Congress).  Under this theory, BOP's discretionary decision to altogether cease funding the Program renders the statute a nullity, thereby effectively repealing 18 U.S.C. section 4046 in violation of the Constitution.  Yet because the Court has found that BOP's decision does not render the statute a nullity, it cannot then also effectively repeal the statute under petitioner's theory.

Petitioner also contends that the BOP decision to cancel the Program infringes on the Judicial Branch, as well, because it renders United States Sentencing Guideline §5F1.7 a nullity.  But this argument fails for two reasons.  First, the guideline was created after the statute went into effect and it expressly incorporates BOP's discretion by merely authorizing a judicial recommendation.  Second, the Sentencing Guidelines are no longer mandatory, thereby rendering a separation of powers argument here implausible.

**II.    Administrative Procedure Act Claims**

**A.    Judicial Review Under the APA**

Petitioner further contends that even if BOP did not exceed its statutory authority, its decision should be invalidated because it was arbitrary and unreasonable.  See Chevron, 467 U.S. at 843-844.  Petitioner argues that the two reasons cited in Director Lappin's letter are "fundamentally flawed" because (1) the studies he cites do not support his conclusion that the Program is ineffective, and (2) he fails to explain how the overage of the Program as compared to regular inmates adds up to $1.2 million.  Respondents assert that the Court should not even evaluate the basis for BOP's decision because it is an administrative decision "committed to agency discretion" not subject to judicial review.

The Supreme Court, in interpreting 5 U.S.C. section 701(a)(2) of the Administrative Procedure Act, has held that judicial review is not appropriate "in those rare circumstances where the relevant statute 'is drawn so that a court would have no meaningful standard

United States District Court

For the Northern District of California

1   against which to judge the agency's exercise of discretion.'" Lincoln v. Vigil, 508 U.S. 182,

2   191 (1993) (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)).  "In such a case, the

3   statute ('law') can be taken to have committed the decision-making to the agency's judgment

4   absolutely." Id.  Because Congress financed the Program through a lump-sum appropriation

5   to BOP for its yearly budget, respondents argue that BOP's decision is peculiarly within its

6   domain of expertise and should not be reviewed for reasonableness by this court.

7        The Court agrees with respondents.  In Lincoln, the Supreme Court considered the

8   validity of the federal Indian Health Service's termination of a local program for Indian

9   children in order to reallocate the program's resources on a national basis.  Relying on the

10  fact that, like here, Congress did not expressly allocate funds for the particular program, the

11  Court held: "The allocation of funds from a lump-sum appropriation is another administrative

12  decision traditionally regarded as committed to agency discretion." Id. at 192.  In particular,

13  among factors "which are peculiarly within [the agency's] expertise" is "whether the agency

14  has enough resources to fund the program at all." Id. at 193 (quoting Heckler, 470 U.S. at

15  831).  As a result, BOP's determination to cancel the Program in part because of financial

16  considerations thereby firmly places its decision under Lincoln.

17       Petitioner attempts to distinguish this case from Lincoln in two ways.  First, petitioner

18  argues that the issue in Lincoln pertained to a reallocation of funds among agency-created

19  programs.  Here, on the other hand, petitioner contends that Congress created the Program

20  and the funds were not reallocated among similar programs; rather, the funds were ostensibly

21  reallocated to completely separate concerns.  As a result, petitioner argues that the case

22  should be controlled by Morton v. Ruiz, 415 U.S. 199 (1974).  In Morton, the Court held that

23  the Bureau of Indian Affairs' failure to publish a rule in the Federal Register that affected a

24  particular class of individuals potentially eligible for benefits under the Snyder Act violated

25  its own regulations, not those of the APA.  415 U.S. at 236. As the Lincoln Court explained,

26  however, the Court in Morton did not address the requirements of the APA, other than to

27  note that the BIA had incorporated those requirements into their own procedures.  See

28  Lincoln, 508 U.S. at 199 (interpreting Morton to hold "that the Bureau's failure to abide by

13

United States District Court

For the Northern District of California

1   its own procedures rendered the provision invalid").  The <u>Morton</u> Court never addressed the

2   issue of whether BIA's *ad hoc* decision was one of the "rare circumstances" that was

3   committed to agency discretion under the APA because the analysis centered around

4   Congress's intent vis a vis the BIA's own manual.  Therefore, the Court finds that <u>Lincoln</u>

5   controls.

6          Second, petitioner argues that even under <u>Lincoln</u>, BOP's allocation of its lump-sum

7   appropriation  must still meet its statutory responsibilities.  <u>See</u> <u>Lincoln</u>, 508 U.S. at 193

8   ("[A]s long as the agency allocates funds from a lump-sum appropriation to *meet permissible*

9   *statutory objectives*, § 701(a)(2) gives the courts no leave to intrude.") (emphasis added).  In

10  <u>Lincoln</u>, petitioner notes that the agency merely reallocated funds among *existing* programs

11  and thereby continued to provide the services at issue.  Here, however, BOP has denied the

12  Program--the service at issue--to all putative beneficiaries and therefore has not fulfilled its

13  statutory responsibility to run the Program in some form or manner.  Yet this argument

14  presupposes that BOP is required to administer the Program, which, as explained above, the

15  Court has determined is not the case.  Because Congress did not require BOP to administer

16  the Program, it created no statutory responsibility to that effect.

17         The Court finds that there is no meaningful standard with which to judge the

18  reasonableness of the agency's decision on how to allocate its lump-sum appropriation.  As a

19  result, BOP's decision is committed to agency discretion and therefore unreviewable under

20  the APA.

21                  **B.      Notice and Comment**

22         The parties do not dispute that BOP's termination of the Program did not give public

23

24  notice or an opportunity to comment as required under the APA for substantive or legislative

25  rules.  <u>See</u> 5 U.S.C. § 551 et seq.  The dispute here turns on whether BOP was required to

26  adhere to those notice-and-comment provisions.

27         Petitioner argues that BOP's decision violates the notice-and-comment requirement of

28  the APA and therefore urges the Court to invalidate BOP's decision.  First, petitioner argues

**United States District Court**

**For the Northern District of California**

1   that this new 'rule' is a substantive or legislative rule, not an interpretive rule.  To support

2   this argument, petitioner relies on a recent Ninth Circuit case to argue that a categorical

3   disqualification of a group of people from a discretionary BOP program is a substantive rule

4   that requires notice-and-comment.  See Paulsen v. Daniels, 413 F.3d 999, 1003 (9th Cir.

5   2005).  Second, petitioner argues that respondents promulgated regulations overseeing the

6   implementation of the Program pursuant to the notice-and-comment requirements of the

7   APA, and therefore it can only take further action under those requirements, as well.

8       Even assuming *arguendo* that petitioner is correct in asserting that the BOP decision

9   was substantive, it is of no moment if the decision falls into an exception to the notice-and-

10   comment requirement under the APA.  See 5 U.S.C. §  553(b)(3)(A) (noting that the notice-

11   and-comment requirements do not apply "to interpretative rules, *general statements of policy*,

12   or rules of agency organization, procedure, or practice") (emphasis added).  The Supreme

13   Court has defined a 'general statement of policy' as a statement "issued by an agency to

14   advise the public prospectively of the manner in which the agency proposes to exercise a

15   discretionary power." Lincoln, 508 U.S. at 197 (internal citations omitted).  There, the Court

16   held:

17       "Whatever else may be considered a 'general statemen[t] of policy', the term surely
18       includes an announcement like the one before us, that an agency will discontinue a
         discretionary allocation of unrestricted funds from a lump-sum appropriation."

19

20   Id.; see also McLean at *4.

21       The Court is disappointed that BOP unilaterally terminated the Program without any

22   input from or formal consultation with the Federal Judiciary, or, for that matter, with

23   prosecutors and defense lawyers.  The Program was one of a dwindling few within the

24   federal penitentiary system that recognized the importance of rehabilitation to first-time

25   offenders, so many of whom are drug offenders who often suffer from poor education, a lack

26   of guidance, and a dearth of employment opportunities.  The Program, with its strict

27   discipline and educational and vocational components, was acutely and properly focused on

28

United States District Court

For the Northern District of California

1    reducing the rate of recidivism.  At the very least, BOP would have benefitted from the input

2    of others who operate in the criminal justice system on a daily basis.

3         Nevertheless, the Court is bound by precedent, and the Supreme Court has clearly held

4    that decisions such as these are considered general statements of policy and are therefore

5    exempt from the notice-and-comment requirement.  See Lincoln, 508 U.S. at 198

6    ("[D]ecisions to expend otherwise unrestricted funds are not, without more, subject to the

7    notice-and-comment requirements of section 553.").  The Court is not persuaded by

8    petitioner's argument that Morton v. Ruiz, and not Lincoln, controls.  First, in Morton, the

9    general assistance program at issue was the subject of a formal budget request from the

10   responsible agency, the Bureau of Indian Affairs.  See Morton, 415 U.S. at 208-209.  While

11   Congress's appropriations authorizations to the BIA were consistently broad, they were not

12   lump-sum appropriations similar to those at issue here and in Lincoln.  Id.  Second, the BIA

13   did not argue that the eligibility assessment it made in Morton fell into one of the exceptions

14   to the APA, and consideration of those exceptions apparently did not motivate the Supreme

15   Court since no mention of them was made in the opinion.  Id. at 235-236.  Moreover, the

16   Court was motivated by the *ad hoc* nature of the BIA's decision to deny funding to some but

17   not all individuals in a similar class.  Id. at 236.  In Lincoln and here, the concern is not an ad

18   hoc determination; rather, the concern relates to a uniform decision to reallocate funds away

19   from a particular program.  Finally, and perhaps most importantly, the Lincoln Court noted

20   that the notice-and-comment requirements of section 553 were not even at issue in Morton.

21   See Lincoln, 508 U.S. at 199.  For the aforementioned reasons, the Court finds that Lincoln,

22   not Morton, controls this case with regard to petitioner's notice-and-comment argument.

23   Thus BOP's decision falls into the exception to the notice-and-comment provisions for

24   general statements of policy.

25   //

26   //

27   //

28   //

16

**United States District Court**

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 4.   Retrospective Claims

#### A.   *Ex Post Facto* Clause

The *Ex Post Facto* Clause forbids any law to impose "a punishment for an act which was not punishable at the time it was committed; *or imposes additional punishment to that then prescribed*." Weaver v. Graham, 450 U.S. 24, 28 (1981). "To fall within the *ex post facto* prohibition, a law must be retrospective – that is, 'it must apply to events occurring before its enactment'– and it 'must disadvantage the offender affected by it' by altering the definition of criminal conduct or increasing the punishment for the crime." Lynce v. Mathis, 519 U.S. 433, 441 (1997) (internal citations omitted). "A law need not impair a 'vested right' to violate the *ex post facto* prohibition." Weaver, 450 U.S. at 29. Put simply, the *ex post facto* prohibition "forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred." Id. at 30.

Petitioner relies primarily on Lynce v. Mathis, 519 U.S. 433 (1997), to argue that the retrospective application of BOP's decision to petitioner's sentence violates the *Ex Post Facto* Clause. In Lynce, the Court determined that the Florida Attorney General's interpretation of a 1992 statute as having retroactively cancelled all provisional credits awarded to inmates convicted of murder and attempted murder violated the *Ex Post Facto* Clause. The Court stated that the basic principle behind the *Ex Post Facto* Clause includes protecting "the indigent defendant engaged in negotiations that may lead to an acknowledge of guilt and a suitable punishment." Lynce, 519 U.S. at 440. The Court noted that "retroactive alteration of parole or *early release provisions*, like the retroactive application of provisions that govern initial sentencing, implicates the Ex Post Facto Clause...." Id. at 445 (emphasis added). Removal of such provisions "can constitute an increase in punishment, because a 'prisoner's *eligibility for reduced imprisonment* is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." Id. at 445-446 (quoting Weaver v. Graham, 450 U.S. 24, 32 (1981)). Similarly, petitioner argues that the termination of the Program eliminated the possibility of a reduction

1    in petitioner's sentence after she and the judge had relied on that possibility first in the plea

2    agreement and then in sentencing.

3         Respondents argue that the *Ex Post Facto* Clause pertains exclusively to penal

4    statutes, not to the elimination of a discretionary BOP program.  To that end, respondents

5    contend that (1) there is no new law at issue here, and that (2) petitioner's sentence has not

6    increased as a result of the agency action.  Because placement in the Program is not

7    guaranteed, nor is completion of the Program, respondents argue that the removal of an

8    opportunity for placement into a discretionary program is not a change in sentence.  "To hold

9    otherwise ... confers upon every inmate a statutory right to any discretionary program

10   provided by the BOP in the rehabilitation of its prisoners."  Def. Opp. at *10.  Respondents

11   rely on California Dept. of Corrections v. Morales, 514 U.S. 499 (1995), where the Court

12   ruled that an amendment to California's parole procedures that decreased the frequency of

13   parole hearings for certain offenders had not made any "change in the 'quantum of

14   punishment'" and did not violate the *Ex Post Facto* Clause. 514 U.S. at 508.

15        As a threshold matter, the Court must determine whether BOP's decision to terminate

16   the Program qualifies as a "law" for *ex post facto* purposes.  Generally, the *Ex Post Facto*

17   Clause applies only to laws or statutes passed by an act of Congress or a state legislature.

18   See Collins v. Youngblood, 497 U.S. 37, 41 (1990) ("It has long been recognized by this

19   Court that the constitutional prohibition on *ex post facto* laws applies only to *penal statutes*

20   which disadvantage the offender affected by them.") (emphasis added); see also U.S. Const.,

21   Art. I, § 9, cl. 3 ("No ... ex post facto Law shall be passed.").  Both Lynce and Weaver, on

22   which petitioner primarily relies, involved legislative acts that reduced the amount of gain-

23   time already awarded to the inmate.  Here, no legislative act is at issue; rather, the relevant

24   act is a discretionary, executive action made pursuant to the implementation of a

25   congressional statute.

26   //

27   //

28

18

**United States District Court**

For the Northern District of California

1      The Ninth Circuit has not yet addressed whether a BOP regulation qualifies as a "law"

2 for *ex post facto* purposes.[4]  In determining whether a directive constitutes a 'law' for *ex post*

3 *facto* purposes, the Ninth Circuit has drawn a distinction between the United States Parole

4 Commission guidelines and other state-related guidelines and regulations that "have the force

5 and effect of law."  See Flemming v. Oregon Bd of Parole, 998 F.2d 721, 725-726 (9th Cir.

6 1993); Smith v. United States Parole Comm'n, 875 F.2d 1361, 1367 (9th Cir. 1988).

7 Flemming narrowed Smith "to the context of federal parole guidelines and their related

8 regulations," and rejected the Oregon Board of Parole's argument that the parole regulations

9 at issue were not "laws" for *ex post facto* purposes because "the Board was at all times free

10 to refuse any reduction in prison sentences." Id. at 727, 725.  Citing Weaver for the

11 proposition that discretionary elements of laws could give rise to *ex post facto* violations,

12 Flemming relied on Miller v. Florida to hold that the retroactive application of Oregon's

13 parole regulations to calculate Mr. Flemming's sentence violated the *Ex Post Facto* Clause.

14 See id. at 726 (noting that Oregon considered its parole regulations to have "the force and

15 effect of law").  On the other hand, Smith held that Parole Commission regulations, like its

16 guidelines, are not 'laws' for *ex post facto* purposes.  See Smith, 875 F.2d at 1367.  The court

17 concluded that "[e]x post facto concerns do not obtain where a regulations serves not as a

18 binding constraint on the administrative decision-making process, but merely as a guide to

19 the proper exercise of discretion."  Id.

20      Here, the Court finds that BOP's decision to terminate the Program more closely

21 aligns with Smith than Flemming.  The relevant provision here is an agency's alteration of its

22 implementation of a Program authorized by congressional statute.  BOP has broad discretion

23 under the authorizing statute whether to implement the Program and how it should be

24 administered.  To that end, respondents cite to BOP regulations implementing the Program,

25

26 _____

27     [4]At least one other circuit has addressed this issue and indicated that BOP regulations are *not* laws for *ex post facto* purposes.  See Warren v. Miles, 230 F.3d 688, 692 (5th Cir. 2000)

28 (noting that the Fifth Circuit has "suggested that the retroactive application of BOP regulations reflecting the agency's "reasonable exercise of properly delegated discretion" does not violate the *ex post facto* doctrine") (quoting Wottlin v. Fleming, 136 F.3d 1032, 1037 (5th Cir. 1998).

which have always maintained that placement in the Program is dependent on "the availability of Bureau resources." 28 C.F.R. § 524.31(b). A decision to terminate the Program based, at least in part, on the availability of Bureau resources is a discretionary decision made pursuant to statute and regulations. To be sure, the holding in <u>Smith</u> relied on the fact that the Parole Commission maintained discretion to disregard its own instructions, whereas BOP's decision renders any remaining discretion immaterial. Yet as the Court explained above, BOP maintains the discretionary authority to reinstate the Program at any point in the future. As a result, its decision is not a "binding constraint on the administrative decision making process;" rather, it is a proper exercise of BOP's discretion under the statute.[5] Moreover, BOP's decision more closely resembles a federal parole regulation or guideline than a state sentencing or parole guideline that has been interpreted by that state's law to have the "force and effect of law." <u>See</u> <u>Miller</u>, 482 U.S. at 435; <u>Flemming</u>, 998 F.2d at 726. The Court can find no case holding that BOP regulations have the "force and effect of law." Thus the Court finds that BOP's decision to terminate the Program is not a law for *ex post facto* purposes. Therefore, the Court need not evaluate whether the decision violates the constitutional prohibitions under the *Ex Post Facto* Clause.

### B.   Retroactivity Doctrine

In the alternative to her *ex post facto* argument, petitioner contends that the retroactivity doctrine counsels against applying BOP's decision to anyone who had already been sentenced prior to the decision. <u>See</u> <u>Cort</u>, 113 F.3d at 1084 ("[E]ven where the Ex Post Facto Clause is not formally applicable, 'prospectivity remains the appropriate default rule'") (quoting <u>Landgraf. v. USI Film Prods.</u>, 511 U.S. 244, 272 (1994) ). Many of the same principles underlying the *Ex Post Facto* Clause motivate the retroactivity doctrine. <u>See</u> <u>Landgraf</u>, 511 U.S. 244, 265 ("Elementary considerations of fairness dictate that individuals

---

[5]It is also worth noting that section 4046(c) confers complete and absolute discretion to BOP to determine whether and to what extent a sentence reduction is appropriate for those inmates who complete the Program. Eligibility or acceptance into the Program does not necessitate a sentence reduction by law.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   should have an opportunity to know what the law is and to conform their conduct

2   accordingly; settled expectations should not be lightly disrupted.").

3       Petitioner relies on Bowen v. Hood, 202 F.3d 1211 (9th Cir. 2000) and Cort v.

4   Crabtree, 113 F.3d 1081 (9th Cir. 1997) to argue that retroactive application of BOP rules is

5   impermissible.  Petitioner stresses that her legally cognizable "settled expectations" ripen

6   upon the judicial recommendation of the judge, which gives her the opportunity for

7   consideration of a shorter sentence.  By changing the calculus under which petitioner decided

8   to plead guilty and the judge decided on the sentence, petitioner contends that the BOP is

9   applying a new rule retroactively, thereby impermissibly altering petitioner's sentence.

10      Respondents argue that BOP's termination of the boot camp program is not

11  impermissibly retroactive because it has not "attache[d] new legal consequences to events

12  completed before its enactment."  Landgraf, 511 U.S. at 270.  Respondents distinguish Cort

13  and Bowen as cases where prisoner eligibility for a particularly program had already been

14  conferred before it was taken away.  But here, respondents argue, petitioner was never

15  formally admitted into the boot camp program, so removing that opportunity does not upset

16  "settled expectations."

17

18      To be sure, the Ninth Circuit has acknowledged that "[a] prisoner's right to

19  *consideration* for early release is a valuable one that we have not hesitated to protect." Cort,

20  113 F.3d at 1085.  Yet the circuit has consistently held that BOP impermissibly applied rule

21  changes only when the prisoners were notified of their eligibility for the relevant program.

22  See Bowen, 202 F.3d at 1222 ("[T]he BOP impermissibly applied its rule changes to the ...

23  inmates in violation of the retroactivity doctrine after notifying them of their eligibility for

24  early release."); Cort, 113 F.3d at 1086-87 ("We hold that Change Notice CN-01 applies only

25  to prisoners who had neither entered the substance abuse treatment program nor received

26  favorable eligibility determinations as of the date of its issuance.").  Moreover, "[a] prisoner's

27  expectation of early release may only arise when the BOP makes a lawful determination of

28

United States District Court

For the Northern District of California

1   the prisoner's eligibility and then informs the prisoner of such eligibility." <u>Furguiel v.</u>

2   <u>Benov</u>, 155 F.3d 1046, 1048 (9th Cir. 1998).

3       Here, petitioner contends that her case manager, Linda Rodriguez, affirmatively

4   informed her that she was eligible for the Program. <u>See</u> Decl. of Nora Luz Serrato.

5   Respondents dispute that petitioner was ever told she was eligible for the Program. <u>See</u> Decl.

6   of Linda Rodriguez, Exh. 2 at *2 (noting in petitioner's initial program review report, which

7   was signed by petitioner, that one of petitioner's long-term goals was to "complete boot camp

8   program *if eligible*"); <u>see also id.</u> at Exh. 3 (noting on November 17, 2004, that after sentence

9   was adjusted, petitioner "may be eligible for ICC program now"). Even assuming that

10   Rodriguez did tell petitioner that she was eligible for the Program, petitioner presents no

11   evidence of any formal notification from BOP. <u>See</u> Decl. of Tammy Jones ¶ 5 (noting that

12   Attachment D to Program Statement 5390.08, which sets forth the rules for implementing the

13   Program, is completed once a prisoner is deemed eligible for the Program). Petitioner has

14   offered no evidence to either rebut defendant's evidence of how formal notice of eligibility is

15   conferred on prisoners or to show that she did receive formal notice of her eligibility.

16   Without that evidence, the Court cannot find that BOP determined that petitioner was eligible

17   for the Program before she was informed of the pending termination of the Program.[6]

18   Moreover, no court has extended the retroactivity doctrine to situations such as this one,

19   where an individual was sentenced with an expectation of consideration for a program that

20   was terminated before a determination of eligibility was made. The Court declines to be the

21   first to do so. Although the Court sympathizes with petitioner's claim, and acknowledges

22   that an expectation of consideration for the Program likely factored into the decision to reach

23   a disposition before trial, the Court is constrained by the law of this circuit. Therefore, the

24   Court finds that BOP's application to petitioner of the decision did not violate the

25   retroactivity doctrine as defined by the Ninth Circuit.

26   //

27

28       [6]While her subsequent determination of eligibility for boot camp was sufficient for
    purposes of standing, she had not received that notice at the time BOP terminated the Program.

**United States District Court**

**For the Northern District of California**

### CONCLUSION

BOP's decision to terminate the Program without even so much as an inquiry to the Judiciary--which, after all, sentences federal defendants--is inexplicable. Petitioner appears to be precisely the sort of offender that would benefit from the rigid discipline and vocational benefits provided by the boot camp. But as a legal matter, the Court finds that BOP's decision to abruptly terminate the boot camp program was within its broad discretion and its execution complied with all constitutional requirements. Accordingly, for the reasons explained above, the petition for a writ of habeas corpus is DENIED.

The parties shall abide by their agreement, as explained more fully in open court on December 1, 2005, as to how the remainder of petitioner's sentence shall be executed.

**IT IS SO ORDERED.**

Dated: December 19, 2005

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE